264 F.2d 926
 UNITED STATES of America ex rel. TOM MAN, also known as Tom
Gin Sing, Relator-Appellee,
v.
John L. MURFF, as District Director of the Immigration and
Naturalization Service of the United States Department of
Justice for the District of New York, or such person, if
any, who might have said relator in custody, Respondent-Appellant.
 No. 138, Docket 25304.
 United States Court of Appeals Second Circuit.
 Argued Jan. 20, 1959.
Decided March 3, 1959.
 
 Roy Babitt, Arthur H. Christy, U.S. Atty. for the Southern Dist. of New York, New York City, for respondent-appellant.
 Max K. Schlem, Spar, Schlem & Burroughs, New York City, for relator-appellee.
 Before HAND and WATERMAN, Circuit Judges, and BRERS, District Judge.
 HAND, Circuit Judge.
 
 
 1
 The District Director of Immigration and Naturalization appeals from an order of Judge Dimock, sustaining a writ of habeas corpus and releasing the relator from the Director's custody. The relator was born in China and last entered the United States in 1925 as a seaman upon a British ship; concededly he is subject to deportation for having long overstayed the time permissible to a seaman who leaves his ship. Deportation proceedings were begun against him in 1952, a Board of Special Inquiry found him subject to deportation in 1954, and the District Director issued a warrant for his deportation 'pursuant to law.' 243(a) of the Immigration and Nationality Act (1253(a), Title 8 U.S.C.A.), provides that the Attorney General shall 'direct' the 'country' to which an alien shall be deported; but that the alien may choose the 'country' to which he shall be sent, if that 'country' is willing to accept him, and if the Attorney General thinks that it will not be 'prejudicial to the interests of the United States,' to send him there.
 
 
 2
 The relator specified 'Formosa' as the 'country' to which he wished to be deported, and the Attorney General applied to the National Chinese Government to 'accept' him. That government, however, refused to do so, whereupon the Attorney General directed him to be sent to 'China,' which, as both sides agree, meant the 'mainland of China.' This appeal depends upon whether the Act permits this disposition, provided that in addition it is shown that the Attorney General is properly satisfied, that if so deported, he will not be subject to 'physical persecution,' (243(h)). The relator had a hearing upon that issue and the Attorney General was so satisfied; but Judge Dimock refused to review the finding because the Act did not permit deportation to China even though the relator would not be subject to 'physical persecution.' His reason was that the Attorney General had not 'inquired' of the Communist Government of China whether it was willing to 'accept' the relator.
 
 
 3
 Section 243(a) provides that, if the 'country' selected by the alien, will not 'accept' him, he shall be deported to 'any country of which such alien is a subject national, or citizen if such country is willing to accept him into its territory.' As the relator was born in China, he is 'a subject national' or a 'citizen' of either the Nationalist Government of China, or the de facto Communistic Government, but, since the Attorney General has made no inquiry of the latter, it is as yet undecided whether that government will 'accept' him when he is produced at its border. The appellant, however, argues that it will be enough if the Communist Government does 'accept' him at that time, and that to rule otherwise will be to invade the prerogative of the Executive Department by compelling it to do something that would, or might be, deemed a 'recognition of' the Communist Government.
 
 
 4
 Certainly if the relator is to be regarded as a 'subject national, or citizen' of Nationalistic China, he may not be deported because that government will not 'accept' him. We assume that he cannot be regarded as a 'subject national, or citizen' of the Communist Government, because we do not recognize that as more than a de facto government. There remains therefore one or more of the seven subdivisions of 243(a) of which number three certainly covers him and probably several others. However, we think that deportation under any of these is subject to the condition expressed in the seventh subdivision: i.e. that the 'country' shall be 'willing to accept' him 'into its territory.'
 
 
 5
 If so, all that it remains to decide is whether the preliminary inquiry is a condition upon that acceptance that is required in the case of the 'country' of the alien's choice or that of the country of which he is a 'subject national, or citizen.' We cannot see any reason to suppose that the necessary consent in such situations should not follow the pattern laid down earlier in the section; and moreover it would be to the last degree cumbersome and oppressive to shuttle an alien back and forth on the chance of his acceptance, when it was possible to ascertain the truth in advance by inquiry. Nor can we agree that it would be any greater 'recognition' of the de facto government of China to secure his acceptance after a preliminary inquiry, than to do so without any inquiry. In each case there must be a mutual agreement between that 'country' and ourselves; and the only distinction is as to the time when the agreement shall be made. Although United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 218 F.id 316, decided that such an alien as this relator might be deported to the 'mainland of China,' it did not suggest that this could be done without any preliminary inquiry.
 
 
 6
 Nor do we see any contradiction in denying the validity of such an administrative order as that at bar, and sustaining an order for deportation to Hong Kong, a British possession.[1] Such an order does of course make it possible for Hong Kong to deport the alien across the border into the 'mainland of China,' but that must be by some positive action of the British Government, dependent upon its own choice.
 
 
 7
 We need not say what would be the result, if it were shown that there had been an agreement between Britain and ourselves that all persons deported to Hong Kong it would in turn deport to the mainland. That would presuppose a deportation to Hong Kong, which is not the case at bar.
 
 
 8
 Order affirmed.
 
 
 
 [1]
 Decision of Dimock, J., April 18, 1958, Chong Chak v. Murff, 172 F.Supp. 150